**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTINA CARSON ROBERDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11-CV-1027 CAS |
| | ) | |
| AT&T OPERATIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court on defendant AT&T Operations, Inc.'s ("AT&T") motion for summary judgment. Plaintiff Christina Carson Roberds ("plaintiff") opposes the motion and it is fully briefed. Because the undisputed evidence demonstrates that plaintiff's complaint does not raise any genuine issues of material fact for trial, the motion will be granted.

**I. Background**

Plaintiff was employed by defendant AT&T beginning in September 2003 and was terminated from employment in May 2010. Plaintiff filed this action in June 2011, alleging that her termination was in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq. (Count I), and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010, et seq. (2000) (Count II). Plaintiff voluntarily dismissed her federal FMLA claim with prejudice in June 2012. After inviting briefing from the parties, the Court determined that it has diversity jurisdiction over plaintiff's MHRA claim. See Memorandum and Order of July 6, 2012 (Doc. 28).

In the remaining MHRA claim, plaintiff alleges pregnancy discrimination, asserting that her pregnancies were a contributing factor in the termination of her employment; and disability discrimination, asserting that (1) her pregnancies were an actual disability and a contributing factor

in the termination of her employment, and (2) her pregnancies were a perceived or "regarded as" disability and a contributing factor in the termination of her employment.

## II. Facts[1]

1. Plaintiff Christina Carson Roberds is a former senior consultant for AT&T Operations, Inc. at its Consumer Sales and Service Call Center in Olivette, Missouri (Pl. Dep. 16-17; Hill ¶5).[2]

2. As a senior consultant, plaintiff's job duties included handling sales and service contacts with customers, and using computer systems to initiate and complete service orders and handle customer requests, complaints and inquires, while working to meet revenue goals, service commitments and other deadlines, and investigating and resolving customer billing issues (Pl. Dep. 17-18; Hill ¶6).

---

[1]The Court notes that plaintiff admitted the vast majority of AT&T's uncontroverted statements of material facts. The statements of fact plaintiff attempted to controvert are addressed individually, infra. Plaintiff also offered an additional fifteen statements of fact in response to AT&T's statement of facts, but only two of those facts contain a citation to any portion of the record before the Court on summary judgment. Local Rule 4.01(E) requires a party opposing a motion for summary judgment to set forth matters in dispute "with specific references to portions of the record, where available, upon which the opposition party relies. . . . All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." L.R. 4.01(E). Plaintiff largely failed to comply with Local Rule 4.01(E) in her additional statements of fact. The "concision and specificity required" by rules such as Local Rule 4.01(E) "seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge." Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) (cited case omitted). This type of local rule "exists to prevent a district court from engaging in the proverbial search for a needle in the haystack. Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." Id. (internal quotation and citation omitted). The Court will disregard any of plaintiff's statements of fact that are not supported by reference to any portion of the record.

[2]Parenthetical references "Pl. Dep." are to the Deposition of Plaintiff, Def.'s Ex. A. Parenthetical references to "Hill ¶" are to the Declaration of Rick Hill and the exhibits to his declaration, Def.'s Exs. B1-13 (filed under seal).

3. This was a full-time, non-management position whose terms and conditions are governed by the applicable agreement between AT&T and the Communications Workers of America (Pl. Dep. 16-17; Hill ¶7).

4. Plaintiff had a net credited service ("NCS") or seniority date of October 23, 2003 (Hill ¶8).

5. Senior consultants such as plaintiff are supervised by employees holding the title Coach Leader (Pl. Dep.19; Hill ¶9).

6. The Coach Leaders report to the Center Sales Manager who in turn reports to the General Manager (Pl. Dep. 32-33; Hill ¶10).

**The Positive Discipline Process**

7. AT&T managers impose positive discipline when an employee's job performance is deficient in attendance, safety and/or measurement of work (Hill ¶11).

8. At the first level of discipline, the employee's supervisor implements a "Performance Notice" and the supervisor and employee discuss the performance issue (Hill ¶12). A union representative may also be present. The employee is informed of the deficient area of performance and the consequences if there is no improvement. The written Performance Notice is placed in the employee's file, and remains "active" for six months (Hill ¶12).

9. If the first level Performance Notice does not resolve the issue, the next step in the process is referred to as the second level "Written Reminder" (Hill ¶13). This Written Reminder includes a formal discussion between the employee and his or her supervisor about a serious performance issue. An actual written reminder of the discussion is given to the employee documenting the conversation (Hill ¶13). This second level of discipline is reached when the employee has not corrected a performance deficiency within six months following issuance of a

Performance Notice (Hill ¶13). The employee is entitled to have a union representative present at the meeting (Hill ¶13). The Written Reminder is "active" for nine months. If the same problem continues while the Written Reminder is active, the employee reaches the Level Three, which is called a Decision Making Leave ("DML") (Hill ¶13).

10. The DML is the third and final level of the Positive Discipline system (Hill ¶14). The third level begins with a discussion, during which the employee is informed about an extremely serious performance problem that can result in dismissal. At the end of the meeting, the employee is placed on a DML for the following work day (with pay) to consider whether he or she can meet the job expectations. The day after that, the employee meets with the supervisor and either commits to meeting all of the conditions of his or her employment or resigns. (Id.). If the employee commits to staying and improving his or her performance, the employee is informed that he or she is subject to dismissal if the problem is not resolved. Again, the employee is entitled to union representation at both meetings. (Id.). The DML is active for twelve months (Hill ¶14).

11. If an employee's performance is deemed unsatisfactory for any reason while he or she is on a DML, the employee may then be suspended by the Center Sales Manager pending termination (Hill ¶15).

12. Following the suspension, the employee is permitted to meet with the Center's Center Sales Manager or General Manager for his or her "Day-in-Court" (Hill ¶17). At the Day In Court Meeting, the employee is given the opportunity to provide information he or she would like to be considered before final decision to either discharge or retain is made (Hill ¶17). After the Day In Court Meeting, a final decision to either discharge or reinstate the employee (Hill ¶17). At the Day-in-Court, the employee is again entitled to union representation. (Id.)

**Plaintiff's Performance Issues and Discipline**

13. The expectations of the job changed over the years and shifted from outbound calls to inbound calls (Pl. Dep. 19-20, 78-80; Hill ¶18).

14. Plaintiff considered the inbound calls more difficult (Pl. 79-80).

15. Plaintiff reported to various Coach Leaders over the years (Pl. Dep. 67-70; Hill ¶19).

16. All of plaintiff's coach leaders worked with her in an effort to improve her performance (Pl. Dep. 73-75; Hill ¶20).

17. The coach leaders had different styles and plaintiff learned different things from each of them (Pl. Dep. 70).

18. Plaintiff testified that she got along with her coach leaders over the years, (Pl. Dep. 67-70), although she filed a union grievance against coach leader Jennifer Gardner sometime in 2007 that "had something to do with [plaintiff] doing union work or union conversations during company time." (Id. at 71-72). Plaintiff also testified that, in general, she got along with Gardner "pretty well" other than the one incident though they "didn't have much contact" and "didn't know each other on a personal level" or "outside of work experiences" but plaintiff would say hello when she would see Gardner in the hall. Id. at 70. In her Affidavit, plaintiff avers that the settlement of her union grievance was that Gardner would never supervise her again. (Pl.'s Aff., ¶9).

19. The coach leaders would provide development time where the sales coach would listen to calls and coached with feedback on the calls on how to improve performance (Pl. Dep. 73-75; Hill ¶21).

20. Plaintiff's supervisors talked with her about the expectation to follow a sales "call flow' and to make sales offers on every call (Pl. Dep. 80-81; Hill ¶22).

21.  As part of that coaching, plaintiff was given a written Call Flow Process Job Aid that she was expected to follow (Pl. Dep. 74, 80-81; Hill ¶23; Ex. B-3).  The Job Aid was on a sheet of paper that was in front of her at her desk every day (Pl. Dep. 83-84).

22.  Plaintiff was evaluated on how well she followed the call flow process (Pl. Dep. 81; Hill ¶24).

23.  On May 28, 2008, plaintiff's Coach Leader Jackie Robinson placed her on a Performance Notice for not meeting performance expectations (Pl. Dep. 86, 88; Hill ¶25; Ex. B-4).

24.  After the Performance Notice, plaintiff received additional coaching and development (Pl. Dep. 91; Hill ¶26).

25.  On October 30, 2008, plaintiff's Coach Leader Nanette Elkins placed her on a Developmental Road Map to improve her job performance because she was below expectations (Pl. Dep. 90; Hill ¶27).  Plaintiff was informed that she would continue on the DRM until her expectation goals were met and that if she did not meet desired performance goals, positive discipline could be imposed (Hill ¶27).

26.  Despite these steps, plaintiff's numbers were not improving, so on November 19, 2008, plaintiff's Coach Leader Kendra Clay placed her on a Written Reminder for unsatisfactory call quality, including not following the required call flow (Pl. Dep. 86-91; Hill ¶28; Ex. B-5).  Plaintiff understood that the Written Reminder remained in effect for nine months (Pl. Dep. 91-92).

27.  On June 18, 2009, plaintiff's sales coach implemented a Developmental Road Map for her due to plaintiff not following the required call flow (Pl. Dep. 97-98; Hill ¶30; Ex. B-6).

28.  Plaintiff's sales coaches continued to have regular developmental sessions in addition to monitoring feedback to try to assist her in improving her performance (Pl. Dep. 91-92-93; Hill ¶29; Ex. B-2).  The coaches would coach her on areas of opportunity, demonstrated role plays,

conducted side by side coaching giving her immediate feedback and reminding her of the expectation to follow the call flow (Pl. Dep. 92-99; Hill ¶29; Ex. B-2). At times, plaintiff's sales coaches also placed her with a high performing representative for peer coaching and she was advised to use the key learnings and coaching received on all calls going forward (Pl. Dep. 73-76, 95; Hill ¶29; Ex. B-2).

29. Plaintiff's sales coaches would also conduct evaluations of plaintiff's calls and met with her to review the evaluation of her calls on December 29, 2008, December 30,2008, January 16, 2009, April 23, 2009, May 19, 2009, June 18, 2009, June 25, 2009, July 9, 2009, July 23, 2009, July 27, 2008, July 30, 2009, August 14, 2009, August 26, 2009, February 15, 2010, February 22, 2010 (Pl. Dep. 93-102; ¶31; Ex. B-2).

30. Between December 19, 2008 and June 2009, plaintiff's scores on the evaluative calls were 47%, 43%, 45%, 73%, 37%, 55%, 48%, 54%, 81%., 44% 35% 48%, 54% and 81% , (Pl. Dep. 93-102; Hill ¶32; Ex. B-2). The expectation was 90% or higher (Pl. Dep. 101; Hill ¶32; Ex. B-2).[3]

31. On June 26, 2009, plaintiff's supervisor put her on a Decision Making Leave (DML) because of her performance deficiency in call quality (Pl. Dep. 102-05; Hill ¶33; Ex. B-7). Plaintiff was informed that the DML would remain active for a period of one year and that "[a] DML is extremely serious and should not be taken lightly. Poor performance impacts the ability to provide an excellent customer experience, revenue results and the quality of customer service. Failure to

---

[3]Plaintiff attempts to controvert the fact that AT&T's expectation was 90% or higher by making the self-serving, conclusory assertion in her affidavit that AT&T's expectations "were not mandates they were goals, which Plaintiff and her coworkers routinely did not achieve." (Pl.'s Aff. ¶¶15-16). Plaintiff offers no reference to any portion of the record to support her assertion, and therefore the Court disregards it. Further, plaintiff repeatedly testified in her deposition that her scores were far below the expectation of 90 percent and that she was coached that the failure to meet AT&T's expectations "could result in discipline up to and including dismissal." (Pl. Dep. 94, 95-96, 97, 98, 100).

meet the expectations set for you listed above is subject to further disciplinary action up to and including dismissal" (Pl. Dep. 104-05; Hill ¶33; Ex. B-7).

32. For the DML, plaintiff was placed on a day off to consider whether she wanted to commit to continuing her employment with AT&T (Pl. Dep. 104-05; Hill ¶34).

33. Plaintiff returned to work and met with her supervisor who asked her for her decision as to whether or not she wanted to continue her employment with AT&T. Plaintiff gave her commitment to continue her employment (Pl. Dep. 108-09; Hill ¶35; Ex. B-8).

34. The developmental and coaching sessions continued after plaintiff's return to work from the DML (Pl. Dep. 110; Hill ¶36; Ex. B-2). Plaintiff was given peer coaching (Pl. Dep. 110; Hill ¶36; Ex. B-2). Her sales coach reminded her that she was on a DML and she could be subjected to further discipline if her performance did not improve (Pl. Dep.111; Hill ¶36; Ex. B-2).

35. On July 9, 2009, her sales coach covered plaintiff on calls observed on which she scored 74% and 77% with the expectation of 90% or higher. The sales coach again coached plaintiff to areas of opportunity and following the call flow process on every call (Pl. Dep. 111-112; Hill ¶37; Ex. B-2).

36. On July 23, 2009, plaintiff's sales coach covered her on a call observed on which she scored 76% and 77% with the expectation of 90% or higher. The sales coach again reminded plaintiff of her previous coaching and advised that she must follow the call flow process on every call or face disciplinary action up to and including dismissal (Pl. Dep. 111; Hill ¶38; Ex. B-2).

37. On July 27, 2009, plaintiff's sales coach conducted side by side coaching and plaintiff failed to follow the appropriate transfer process and failed to follow the required call flow on a call observed on which she scored 76% with the expectation of 90% or higher. The sales coach again reminded plaintiff of her previous coaching and advised that she must follow the call flow process

on every call or face disciplinary action up to and including dismissal (Pl. Dep. 112; Hill ¶39; Ex. B-2).

38.  On July 30, 2009, plaintiff's sales coach covered her on a call observed, scoring 51% with the expectation of 90% or higher.  The supervisor coached to areas of opportunity and following the call flow on every call and reminded plaintiff that failure to improve or follow the call flow on every call could result in disciplinary action up to and including dismissal (Pl. Dep. 112; Hill ¶30; Ex. B-2).

39.  On August 26, 2009, plaintiff was again covered on calls observed in which she scored a 77% and a 61% with the expectation of 90% or higher.  Her supervisor advised her that she could face separation from the company if she continued her failure to follow the call flow (Pl. Dep. 113; Hill ¶31; Ex. B-2).

40.  Plaintiff then went out on approved leaves of absences in the form of short term disability under the company's benefit plan and care of newborn child from September 2, 2009 to January 17, 2010 (Pl. Dep. 113-14).

41.  Plaintiff admits that there was nothing about her pregnancy that interfered with her ability to do her job in any way (Pl. Dep. 181).[4]

42.  When plaintiff returned to work she was assigned to a new sales coach who continued with the coaching and development (Pl. Dep. 139).

43.  Plaintiff understood she could lose her job because she was not meeting performance expectations (Pl. Dep. 129).

---

[4]Plaintiff attempts to controvert this fact by stating in her Affidavit that she took FMLA leave on three different occasions related to two pregnancies and a miscarriage.  The undisputed fact that plaintiff took FMLA leave on these occasions does not controvert her testimony that her pregnancies did not interfere with her ability to do her job.

44. Plaintiff was concerned because she had gone through the steps of discipline about her performance (Pl. Dep. 132).[5]

45. Plaintiff acknowledges that her performance had not improved and she was concerned for her job (Pl. Dep. 133).

46. Plaintiff's sales coach conducted side by side coaching where she scored an 80% and 94% with the expectation of 90%. The manager commended plaintiff for improvements and coached her to follow the 2.0 sales skill and offering all available services to the customer (Pl. Dep. 139-140; Hill ¶42; Ex. B-2). That one call was the only call that had met expectations (Pl. Dep. 140).

47. A week later, plaintiff was again covered on calls observed and that time she scored 70 percent and 82 percent with the expectation of 90% (Pl. Dep. 140; Hill ¶43; Ex. B-2). Plaintiff's coach leader again talked to her about areas of opportunity in following the call flow on every call (Id.). She again reminded plaintiff that failure to follow the call flow on every call could result in disciplinary action up to and including dismissal (Pl. Dep. 140-41; Hill ¶43; Ex. B-2).

48. On February 22, 2010, plaintiff's coach leader covered her on a call observed, on which she scored 83% with the expectation of 90% or higher (Pl. Dep. 141; Hill ¶44; Ex. B-2). Plaintiff's

_____

[5]Plaintiff attempts to controvert this fact by citing her deposition testimony that she was concerned because Jennifer Gardner was going to be her new sales coach and Gardner said she would "get rid of" plaintiff when she returned from leave. Plaintiff's testimony cannot serve to controvert this fact because (1) plaintiff testified unequivocally that she was already concerned about losing her job because she had gone through steps of discipline (Pl. Dep. 132), and (2) her testimony concerning what Gardner allegedly said about her to another employee is hearsay, as pointed out by AT&T, and is inadmissible on summary judgment. On summary judgment, courts "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact. See Shaver v. Independent Stave Co., 350 F.3d 716, 723 (8th Cir. 2003); Fed. R. Civ. P. 56(e)." Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800-01 (8th Cir. 2004).

coach leader role coached played with plaintiff on areas of opportunity and again reminded her that failure to follow the call flow on every call could result in disciplinary action up to and including dismissal (Id.).

49. On March 1, 2010, plaintiff was provided peer coaching and her coach leader role played with her as well (Pl. Dep. 141; Hill ¶45; Ex. B-2).

50. On March 3, 2010, plaintiff's coach leader conducted a joint call with her, helping her with what to say and taking over the call to demonstrate how to close the sale (Pl. Dep. 141-42; Hill ¶46; Ex. B-2). The coach leader advised plaintiff that she was not meeting her revenue target and reset expectations to follow the call flow (Pl. Dep. 142; Hill ¶46; Ex. B-2). She also warned plaintiff again that failure to meet expectations could result in disciplinary action up to and including dismissal (Id.).

51. On March 5, 2010, plaintiff's coach leader advised her that she was not meeting her daily target for sales and that failure to meet the daily expectations could result in disciplinary action up to and including dismissal (Pl. Dep. 142-44; Hill ¶47; Ex. B-2).

52. On March 9, 2010, plaintiff was provided with peer coaching and in addition her coach leader role played with her (Pl. Dep. 144; Hill ¶48; Ex. B-2). The sales coach reminded plaintiff that she was on a DML and that failure to meet expectations could result in disciplinary action up to and including dismissal (Pl. Dep.142; Hill ¶48; Ex. B-2).

53. On March 11, 2010, plaintiff's coach leader covered her on her overall results and she was below expectations on revenue, revenue per call, video, the television product, average handle time and adherence attainment (Pl. Dep. 145; Hill ¶49; Ex. B-2). Plaintiff's coach leader again coached and role played with her and reminded her of the DML (Id.).

54. On March 18, 2010, Rick Hill, the Center Sales Manager, held a meeting with plaintiff to cover a call observed in which she failed to make a recommendation for services to the customer (Pl. Dep. 145; Hill ¶50; Ex. B-9). He explained that it was a disciplinary meeting (Pl. Dep. 187; Hill ¶50; Ex. B-9). At the meeting, Mr. Hill played the call in which plaintiff did not make a recommendation when services were available (Pl. Dep. 186-88; Hill ¶50; Ex. B-9). Plaintiff was unable to offer an explanation as to why no offer of available services to the customer was made (Pl. Dep. 145-46; Hill ¶50; Ex. B-9).[6]

55. At the Suspension Meeting, Mr. Hill stated he did not understand why plaintiff was struggling with making effective offers on calls because she had had numerous coaching sessions with her manager as to how to offer services on every call (Pl. Dep. 187-89; Hill ¶51; Ex. B-9). He talked to her about her performance up to that point and that her offer rate for the year to date was 39 percent with an expectation of 90 percent (Pl. Dep. 189; Hill ¶51; Ex. B-9).

56. At the conclusion of the meeting, plaintiff was suspended due to unsatisfactory measurement of work, including failure to follow call flow and making recommendations to customers for available services (Pl. Dep. 152; Hill ¶52; Ex. B-9).

57. Plaintiff admits her performance had been "really bad" (Pl. Dep. 193).

58. On May 6, 2010, plaintiff had her Day-in-Court with Rick Hill, the Center Sales Manager (Pl. Dep. 153: Hill ¶53; Ex. B-10). At the Day-in-Court, plaintiff was given an opportunity to present information on her behalf (Pl. Dep. 153-54; Hill ¶54; Ex. B-10). Mr. Hill went through the highlights of the most recent coaching from May 2008 until her suspension relating to call flow and the importance of following the call flow on every call (Pl. Dep. 154-55; Hill ¶53; Ex. B-10).

---

[6]Plaintiff admits this fact as to the suspension meeting but attempts to controvert it as to the subsequent "Day-in-Court" meeting, which is discussed infra at ¶ 59.

He talked about plaintiff's low observation scores and the call that was observed where no offer was made (Id.). He also emphasized that she had a sales job and that part of the job was to make a sales offer and to close the sale (Pl. Dep. 155; Hill ¶53; Ex. B-10)

59.   At the Day-in-Court meeting plaintiff did not deny the performance problems that led up to her termination (Pl. Dep. 157; Hill ¶55; Ex. B-10). Plaintiff also acknowledged that she did not make an offer for products on the call that had been observed (Pl. Dep. 158; Hill ¶55; Ex. B-10), although she believes she brought up in the meeting her belief that the customer on that particular call was receiving the "Lifeline discount" and she thought that she was not supposed to offer certain affiliated products to Lifeline customers.[7]

60.   Instead, plaintiff's union representative complained that Plaintiff should not be reporting to her Coach Leader Jennifer Gardner (Pl. Dep. 158-59; Hill ¶56; Ex. B-10). Mr. Hill responded that the decision would have been the same for any sales coach because of plaintiff's performance (Pl. Dep. 158-59, 161-62; Hill ¶56; Ex. B-10).

61.   At the Day-in-Court Meeting, Mr. Hill also reviewed plaintiff's prior performance appraisals (Pl. Dep. 162; Hill ¶57; Ex. B-10).

62.   Plaintiff's Measurement of Work Rating in 2006, 2007, 2008 and 2009 was Below Expectations (Pl. Dep. 162-64; Hill ¶58; Ex. B-10, B-11).

63.   The Measurement of Work Rating was below expectations regardless of which sales coach plaintiff reported to over the years (Pl. Dep. 164; Hill ¶59; Ex. B-11).

---

[7]The Court notes that plaintiff's Affidavit cites to several pages of her deposition testimony that are not part of the record on summary judgment, specifically pages 147 through 150 and 156. Plaintiff's assertion in her Affidavit, that the Lifeline customer did not qualify financially for services and that Jennifer Gardner and Rick Hill "would have known that," is not supported by any cite to the record before the Court, and therefore cannot raise an issue of fact on this point.

**Plaintiff's Dismissal**

64. Following the Day in Court Meeting, Mr. Hill advised plaintiff that she was being dismissed for unsatisfactory work performance while on a DML (Pl. Dep. 159, 190; Hill ¶60).

**AT&T'S EEO Policy**

65. AT&T maintains and enforces an Equal Employment Opportunity Policy that prohibits discrimination and harassment on the basis of, among other things, gender and disability (Pl. Dep. 165-66; Hill ¶61; Ex. B-12).

66. Plaintiff was trained on the EEO policy on an annual basis (Pl. Dep. 165-66).

67. Plaintiff understood that if she had a concern about an equal employment opportunity matter that there was a place for her to go and something she could do to report those concerns (Pl. Dep. 166).[8]

68. Plaintiff did not make any complaints of alleged discrimination during the time she worked at AT&T (Pl. Dep. 165-66).

69. Neither Rick Hill nor Jennifer Gardner made any comments that plaintiff considered to be derogatory based on her pregnancy (Pl. Dep. 197, 204).

**Plaintiff's Pregnancies**

70. Plaintiff took FMLA time each year of her employment, with the exception of 2003 in which she was not yet eligible (Pl. Dep. 122-23).

---

[8]Plaintiff attempts to controvert this fact by stating that she was "too afraid of losing her job to call" and cites page 205 of her deposition testimony in support. Plaintiff's attempt fails because (1) plaintiff's deposition reflects that she testified as stated in paragraph 67 above (Pl. Dep. 166), and (2) page 205 of plaintiff's deposition is not a part of the summary judgment record before the Court. Under Local Rule 4.01(B), "[i]f any memorandum in opposition requires consideration of facts not appearing in the record, the party shall file with its memorandum all documentary evidence relied upon."

71.  Plaintiff gave birth to her first child in 2005 and exhausted all of her FMLA leave (Pl. Dep. 54-55).

72.  Plaintiff returned to work from the birth of her first daughter in March 2006 (Pl. Dep. 61).

73.  Plaintiff took FMLA leave from January 2009 to March 2009 for a miscarriage (Pl. Dep. 176).

74.  In September 2009 plaintiff went out on anticipatory disability leave related to a high-risk pregnancy (Pl. Dep. 177, 182)

75.  Plaintiff gave birth to her daughter then took additional leave time for care of newborn (Pl. Dep. 182-83).

76.  At the time she went out on leave for the birth of her daughter in 2009, plaintiff was on a final step of discipline for her performance; she was not on discipline for attendance (Pl. Dep. 123).

77.  At the time of her termination, plaintiff was not pregnant (Pl. Dep. 197).

## III.  Legal Standard

The Eighth Circuit recently clarified the appropriate standard for consideration of motions for summary judgment, explaining as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.  On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted). The Court also explained what the nonmoving party must do to meet her obligation to show that disputed facts are material:

In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying "facts that might affect the outcome of the suit." Anderson [v. Liberty Lobby, Inc.], 477 U.S. [242] at 248 [(1986)]. The nonmoving party must then categorize the factual disputes in relation to the legal elements of her claim. Id.; Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006).

Quinn v. St. Louis County, 653 F.3d 745, 751-52 (8th Cir. 2011). A party resisting a properly supported motion for summary judgment has the burden to designate the specific facts that create a triable question of fact, Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005). The Court is "not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (quoted case omitted). Self-serving affidavits without support are not sufficient to defeat summary judgment. Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006).

## IV. Discussion

As stated above, plaintiff alleges that her pregnancies and her actual or perceived disabilities were contributing factors in AT&T's termination of her employment. The MHRA prohibits

employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]"  Mo. Rev. Stat. § 213.055.1(1)(a).  "Nothing in this statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient."  Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 819 (Mo. 2007) (en banc).

The Court is mindful of the Missouri Supreme Court's statement that "[s]ummary judgment should seldom be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence."  Daugherty, 231 S.W.3d at 818.  Under the MHRA, a discrimination claim will survive summary judgment if there is a genuine issue of material fact as to whether the protected characteristic was a "contributing factor" in the employer's termination decision.  Id. at 820; see also Korando v. Mallinckrodt, Inc., 239 S.W.3d 647, 649 (Mo. Ct. App. 2007) (citing Daugherty for the proposition that the federal McDonnell Douglas burden-shifting analysis no longer applies to actions brought under the MHRA). "A 'contributing factor' has been defined as one 'that contributed a share in anything or has a part in producing the effect.'"  Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (quoted case omitted).  "When determining whether an MHRA claim survives summary judgment, 'a plaintiff has no higher standard to survive summary judgment than is required to submit a claim to a jury.'"  Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 479 (Mo. Ct. App. 2007) (quoting Daugherty, 231 S.W.3d at 820).

A.  Pregnancy Discrimination

AT&T moves for summary judgment on plaintiff's pregnancy discrimination claims on the grounds that she cannot establish a prima facie case of pregnancy discrimination because: (1) plaintiff was not in a protected class when she was terminated, because she was not pregnant at the time; and (2) there is no evidence creating any inference of discrimination by AT&T based on plaintiff's pregnancy, much less that plaintiff's pregnancy was a contributing factor in the decision to terminate her employment.

The Eighth Circuit, citing Missouri precedent, has articulated the standard a plaintiff must meet to avoid summary judgment on a pregnancy discrimination claim:

> A plaintiff alleging pregnancy discrimination in violation of the MHRA can avoid summary judgment by showing that her pregnancy was "a contributing factor"–not a "substantial or determining factor"–in the challenged decision.  Id. at 819-20; see also Hill [v. Ford Motor Co.], 277 S.W.3d [659] at 664-65 [(Mo. 2009) (en banc)]. Missouri courts define a "contributing factor" as one "that contributed a share in anything or has a part in producing the effect."  Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 867 (Mo. App. 2009) (internal quotation marks and citations omitted).

Wierman v Casey's General Stores, 638 F.3d 984, 1002 (8th Cir. 2011).

In her opposition memorandum, plaintiff states that "her claim is for actual/perceived disability related to her pregnancies and absences while on Family Medical Leave," and discusses only her actual and perceived disability claims based on pregnancy.[9]  Plaintiff offers no opposition to AT&T's motion for summary judgment on her pregnancy discrimination claims.  In its Reply, AT&T asserts that plaintiff has abandoned her pregnancy discrimination claims by failing to address them in response to its summary judgment memorandum.

---

[9]As stated above, plaintiff voluntarily dismissed her federal Family and Medical Leave Act claim with prejudice.

The Court agrees. Plaintiff's opposition to AT&T's motion for summary judgment presents neither argument nor evidence to show that AT&T discriminated against her based on her pregnancy. A party opposing summary judgment "may not rest upon mere allegations or denials . . . , but must set forth specific facts showing there is a genuine issue for trial." Satcher v. University of Ark. at Pine Bluff Bd. of Tr., 558 F.3d 731, 734-35 (8th Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "It [is] not the District Court's responsibility to sift through the record to see if, perhaps, there [is] an issue of fact." Id. at 735. Consequently, the "failure to oppose a basis for summary judgment constitutes waiver of that argument." Id.

In summary, because plaintiff has not shown that her pregnancy was a contributing factor in the decision to terminate her employment, see Wierman, 638 F.3d at 1002, AT&T's motion for summary judgment on plaintiff's pregnancy discrimination claim should be granted.

B. Disability Discrimination

AT&T also moves for summary judgment on plaintiff's disability and perceived disability claims based on her pregnancies. As an initial matter, AT&T states that although the Complaint alleges plaintiff's pregnancies were an actual or perceived disability and were a contributing factor in her termination, she testified in her deposition that her disability was a learning disability – although she did not assert a learning disability in either her EEOC charge or in the Complaint – and testified she did not believe she had any other disabilities except her learning disability (Pl. Dep. 207).

1. Actual Disability Claim

Setting aside the issue whether plaintiff can proceed with her claim of disability discrimination based on pregnancy following the foregoing admission, AT&T asserts that plaintiff cannot establish that: (1) pregnancy is a disability within the meaning of the MHRA, (2) her

pregnancy substantially limited her in performing a major life activity, (3) her alleged disability was a factor in her discharge, or (4) AT&T's legitimate, nondiscriminatory reason for her termination was a pretext for illegal discrimination.

"A claim of disability discrimination under section 213.111 of the MHRA requires a plaintiff to show that: (1) the plaintiff is legally disabled; (2) the plaintiff was discharged; and (3) the disability was a factor in the plaintiff's discharge." Hervey v. Missouri Dep't of Corr., No. SC 92145, __ S.W.3d __, 2012 WL 3627764, at *3 (Mo. 2012) (en banc).

The MHRA defines "disability" as a "physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job[.]'" Mo. Rev. Stat. § 213.010(4). A "disability under the statute must substantially limit or be perceived to substantially limit a major life activity such as 'communication, ambulation, self-care, socialization, education, vocational training, employment and transportation.'" Cook v. Atoma Int'l of America, Inc., 930 S.W.2d 43, 46-47 (Mo. Ct. App. 1996) (quoting Mo. Code Regs. Ann. tit. 8 § 60-3.060(1)(C)); see also Medley v. Valentine Radford Commc'ns, Inc., 173 S.W.3d 315, 320-21 (Mo. Ct. App. 2005) ("[I]n order to be disabled under the MHRA, a person must have an impairment that limits a major life activity and with or without reasonable accommodation that impairment must not interfere with performing a job.")

Plaintiff bears the burden to prove that she was legally disabled at the time of her discharge, an essential element of her MHRA claim. See Hervey, 2012 WL 3627764, at *6. Where, as here, the parties dispute whether plaintiff has a disability within the meaning of the MHRA, the Court must determine whether plaintiff's claim survives summary judgment on the issue of whether she has a disability within the protections of the MHRA, prior to applying the MHRA's "contributing factor"

analysis.  See Daugherty, 231 S.W.3d at 821; see also Hervey, 2012 WL 3627764, at **4-6 (where plaintiff's disability was in dispute, the MAI 31.24 verdict directing instruction was erroneous because it did not require the jury to find the disputed fact of plaintiff's status as disabled).

An impairment or injury that is "medically treatable without significant residual symptoms does not rise to the level of a disability under the MHRA because a major life activity is not permanently substantially limited[.]" Cook, 930 S.W.2d at 47; Wiley v. Ozarks Med. Ctr., 2009 WL 4114387, at *3 (W.D. Mo. Nov. 24, 2009) ("a temporary impairment does not qualify as a disability under the MHRA").  Missouri Commission on Human Rights regulations interpreting the MHRA expressly provide that "[d]isabilities caused or contributed to by pregnancy, miscarriage, legal abortion, childbirth and recovery are, for all job-related purposes, temporary disabilities and should be treated as such."  Mo. Code Regs. tit. 8 § 60-3.040(16)(A).  Although there are no Missouri cases directly addressing the issue, based on the foregoing authorities it would appear that in most instances, a pregnancy-related disability would not constitute a disability under the MHRA.

The Missouri Supreme Court has reiterated that in deciding cases under the MHRA, courts "are guided by both Missouri law and applicable federal employment discrimination caselaw that is consistent with Missouri law."  Daugherty, 231 S.W.3d at 818.  In Daugherty, the court relied on federal cases under the Americans with Disabilities Act ("ADA") to determine whether an employee was disabled under the MHRA.  Numerous federal cases have held that under the ADA, pregnancy does not meet the definition of a physical or mental impairment that substantially limits an individual's major life activities because it is not an impairment, and is not long term or permanent.  See, e.g., Gorman v. Wells Mfg. Corp., 209 F.Supp.2d 970, 975 (S.D. Iowa 2002), aff'd, 340 F.3d 543 (8th Cir. 2003) (per curiam).  Accordingly, courts have rejected arguments that pregnancy is a per se disability.  See Gorman, id.; Navarro-Pomares v. Pfizer Corp., 97 F.Supp.2d 208, 212 (D.P.R.

2000) (noting that no court now maintains that pregnancy is a per se disability), rev'd on other grounds, Navarro v. Pfizer Corp., 261 F.3d 90 (1st Cir. 2001). Further, federal courts generally hold that absent unusual circumstances, pregnancy-related complications do not constitute disabilities as a matter of law.[10]

In this case, plaintiff offers no evidence demonstrating that complications from her pregnancies substantially limited any of her major life activities.[11] Plaintiff concedes that her

---

[10] See, e.g., Stusse v. Von Maur, Inc., 2009 WL 1789379, at *3 (D. Minn. June 23, 2009) (risk of pre-syncope and syncope episodes was not one of the "'extremely rare circumstances' wherein pregnancy with complications can predicate a disability claim under the ADA."); Remick v. Lake State Indus., Inc., 2009 WL 205213, at **15-16 (D. Minn. Jan. 27, 2009) (pregnancy-related condition of abnormal blood clotting in the umbilical cord, which caused multiple miscarriages, was not a disability); Gorman, 209 F.Supp.2d at 976 (pregnancy-related conditions of nausea, vomiting, dizziness, severe headaches, and fatigue were not sufficient to constitute a disability); Kennebrew v. New York City Housing Auth., 2002 WL 265120, at *18 n.32 (S.D.N.Y. Feb. 26, 2002) (gestational diabetes from pregnancy was not a disability); Minott v. Port Auth. of N.Y. & N.J., 116 F.Supp.2d 513, 525 (S.D.N.Y. 2000) (noting that "only in extremely rare circumstances" will complications arising from pregnancy constitute a disability and holding that employee who suffered pregnancy-related complications and miscarried was not disabled); Muska v. AT & T Corp., 1998 WL 544407, at *9 (N.D. Ill. Aug. 25, 1998) (temporary fetal distress did not render pregnant employee disabled); Leahr v. Metropolitan Pier & Exposition Auth., 1997 WL 414104, at **2-3 (N.D. Ill. July 17, 1997) (pregnancy-related complications of high blood pressure and gall bladder problems did not constitute a disability); LaCoparra v. Pergament Home Ctrs., Inc., 982 F. Supp. 213, 228 (S.D.N.Y. 1997) (history of infertility, a prior miscarriage, and spotting and cramping during a pregnancy did not qualify as impairments), overruled on other grounds by Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706 (2d Cir. 2001); Richards v. City of Topeka, 934 F. Supp. 378, 382 (D. Kan. 1996) (pregnancy is not an impairment), aff'd, 173 F.3d 1247, 1250-51 (10th Cir. 1999); Gudenkauf v. Stauffer Commc'ns, Inc., 922 F. Supp. 465, 474 (D. Kan. 1996) (typical complications of pregnancy, including morning sickness, do not constitute a disability); Jessie v . Carter Health Care Ctr., Inc., 926 F. Supp. 613 (E.D. Ky. 1996) (pregnancy with no unusual circumstances was not a disability); Villarreal v. J.E. Merit Constructors, Inc., 895 F. Supp. 149, 152 (S.D. Tex. 1995) (pregnant employee who miscarried was not disabled); Tsetseranos v. Tech Prototype, Inc., 893 F. Supp. 109 (D.N.H. 1995) (employee whose pregnancy was complicated by ovarian cysts was not disabled).

[11] A substantial limitation in performing a major life activity exists for purposes of the MHRA if plaintiff "was 'unable to perform' or 'significantly restricted as to the condition, manner or duration under which' [s]he could perform a particular major life activity." Daugherty, 231 S.W.3d at 821 (quoting Epps v. City of Pine Lawn, 353 F.3d 588, 592 (8th Cir. 2003)).

pregnancies did not interfere with her ability to do her job (Pl. Dep. 181). The record shows that plaintiff took maternity leave from December 23, 2005 through March 6, 2006, following the birth of her first child. There is no evidence that this pregnancy and childbirth were anything other than normal. From January 23, 2009 through March 2009, plaintiff took eight weeks of leave following a miscarriage. In June 2009, plaintiff had "complications" relating to another pregnancy, but there is no evidence in the record regarding the nature or severity of her pregnancy-related "complications." On September 1, 2009, plaintiff began a leave of absence so that she could go on bed rest for her pregnancy. On September 29, 2009, plaintiff gave birth to her child. Following childbirth, Roberds remained on leave until January 19, 2010 to care for her newborn child. Thus, the record demonstrates that each of plaintiff's pregnancies was temporary in nature, and there is no evidence that plaintiff experienced one of the "extremely rare circumstances" where pregnancy-related complications rendered her disabled.

Based on the foregoing, the Court finds that plaintiff cannot establish an issue of fact as to whether her pregnancies rendered her disabled within the meaning of the MHRA, and concludes as a matter of law that plaintiff's pregnancies do not constitute disabilities under the MHRA. AT&T is therefore entitled to summary judgment on plaintiff's disability discrimination claim based on her pregnancy, and the Court need not reach AT&T's other arguments.

### 2. "Regarded as" Disability Claim

To establish a "regarded as" disability claim under the MHRA, plaintiff must show that AT&T either "(1) wrongly believed that [s]he had an impairment that substantially limited one or more major life activities or (2) wrongly believed that an actual, non-limiting impairment substantially limited one or more major life activities." Daugherty, 231 S.W.3d at 821 (citations omitted). Evidence that an employer regarded an employee as having a limitation that does not

constitute a disability is insufficient.  Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 784 (8th Cir. 2006) (ADA case); see Burrow v. Boeing Co., 2011 WL 1594937, at *14 (E.D. Mo. Apr. 27, 2011) (citing Breitkreutz; holding that under the MHRA, employer's awareness of plaintiff's diabetes did not establish that the employer regarding the plaintiff as disabled, where there was no evidence the employer believed plaintiff's diabetes limited her ability to work).  Rather, the plaintiff must offer proof that the employer mistakenly believes the employee is unable to perform a class of jobs or a broad range of jobs.  Daugherty, 231 S.W.3d at 821-22.

Plaintiff has not offered evidence that AT&T believed she was unable to perform a broad class of jobs.  At most, plaintiff has produced evidence that AT&T was aware that:  (1) she was pregnant on several occasions, (2) she suffered a miscarriage and as a result missed eight weeks of work, (3) she had unknown complications with one of her pregnancies, and (4) she began a leave of absence to go on bed rest about four weeks before giving birth.  AT&T's awareness of these non-disabling conditions is insufficient to show that it regarded plaintiff as disabled.  See, e.g., Remick, 2009 WL 205213, at *15 n.22 (employee's disability claim based on pregnancy-related condition of abnormal blood clotting in the umbilical cord, which caused multiple miscarriages, failed under all three ADA definitions of disability); see also Burrow, 2011 WL 1594937, at *14 (evidence that an employer regarded an employee as having a limitation that does not constitute a disability is insufficient).  Because plaintiff cannot show that AT&T regarded her as disabled, AT&T is entitled to summary judgment on her "regarded as" disability claim.

### 3. Evidence of Discriminatory Animus

Even if plaintiff were able to establish a prima facie case of actual or "regarded as" disability discrimination under the MHRA, which she cannot, she has not shown any evidence of discriminatory animus surrounding the termination of her employment sufficient to raise an issue of

fact as to whether her pregnancies were a contributing factor in the decision. Plaintiff attempts to do so in two ways.

First, plaintiff attempts to raise an issue of disparate treatment by contending that AT&T's objective performance expectations were "goals," not "mandates," and that unidentified "coworkers . . . routinely" failed to satisfy the "goals." See Pl.'s Mem. Opp'n Summ. J. at 4 (Doc. 35). The undisputed evidence shows that on May 28, 2008, plaintiff's supervisor, Jackie Robinson, placed her on a Performance Notice for not meeting performance expectations. On October 30, 2008, plaintiff's supervisor, Nanette Elkins, placed her on a Developmental Road Map to improve her performance because she was below expectations. On November 19, 2008, plaintiff's supervisor, Kendra Clay, placed her on a Written Reminder for unsatisfactory call quality. On June 26, 2009, plaintiff was placed on Decision Making Leave because of her performance deficiencies in call quality. Plaintiff understood that she could lose her job because she was not meeting performance expectations. On March 18, 2010, plaintiff was suspended by her second-level manager, Rick Hill, because of unsatisfactory measurement of work. Plaintiff admits that her work performance had been "really bad." Plaintiff's Measurement of Work Rating in 2006, 2007, 2008, and 2009 was Below Expectations. On May 7, 2010, plaintiff's second-level manager, Rick Hill, notified her that her employment was terminated because of unsatisfactory work performance.

While plaintiff contends that unidentified coworkers "routinely" failed to achieve AT&T's "goals," she has not presented any evidence showing that there were any coworkers with similar performance records who were not terminated. Accordingly, plaintiff fails to present evidence of disparate treatment that could raise an issue of fact as to whether her pregnancies were a contributing factor in her termination. Cf. Holmes v. Kansas City, Mo. Bd. of Police Comm'rs ex rel. Its Members, 364 S.W.3d 615, 627 (Mo. Ct. App. 2012) (where African-American police officer showed

that disparate discipline was afforded to specific white officers for similar acts, he set forth "legal and substantive evidence on the facts essential to liability" under the MHRA).

Second, plaintiff contends that supervisor Nanette Elkins told plaintiff in June 2009 that she "needed to cut down on her FMLA leave because employees were being 'walked out' because of it." See Pl.'s Mem. Opp'n Summ. J. at 6 (Doc. 35). This comment fails to demonstrate an issue of fact as to whether plaintiff's pregnancies were a contributing factor in her termination because it was unrelated to the decisional process.

Alleged discriminatory remarks that are unrelated to the decisional process cannot be considered as evidence of discriminatory animus. The Missouri Court of Appeals has stated that "if a decision-maker[']s comments are unrelated to the decisional process, they cannot be considered direct evidence of discriminatory animus." Stanley v. JerDen Foods, Inc., 263 S.W.3d 800, 804 (Mo. Ct. App. 2008); see also Daugherty, 231 S.W.3d at 818 n.4 (recognizing that statements by decision-makers are not direct evidence of discrimination if they are unrelated to the decisional process).

Here, plaintiff has not presented any evidence linking Elkins' alleged comment to the decision to terminate her employment. The undisputed facts show that Elkins was not plaintiff's supervisor at the time her employment was terminated some eleven months after the remark was made, and Elkins was not involved in the termination decision. Consequently, Elkins' remark cannot be considered as evidence that plaintiff's pregnancies were a contributing factor in her termination, and would be insufficient to submit the claim to a jury. Thus, it is insufficient to allow plaintiff's claim to survive summary judgment. See Daugherty, 231 S.W.3d at 820.

## V.  Conclusion

For the foregoing reasons, the Court finds that plaintiff has abandoned her MHRA pregnancy discrimination claim, and concludes that AT&T has established it is entitled to judgment as a matter

of law on plaintiff's MHRA actual disability and "regarded as" disability claims. AT&T's motion for summary judgment should therefore be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant AT&T Operations, Inc.'s motion for summary judgment is **GRANTED**. [Doc. 24]

An appropriate judgment will accompany this Memorandum and Order.



_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  26th  day of September, 2012.